May it please the Court, I'm Michael Bailey, appearing for Lam Research, which was the defendant below and the appellant here. I hope to leave myself five minutes for rebuttal. We'll see how it goes. I have made a strategic decision to use these few minutes this morning on only one of the issues in the brief, and I don't want to suggest that we don't think the other issues discussed in the brief are not solid issues. I am simply picking one that I think made it an error to submit this case to the jury, hoping that I can explore it well enough to add something to what was said in the brief. And that is the Court's decision to permit Aspect to contradict the signed written agreement as to terms that were the final and exclusive statement of the party's agreement on those issues. What exactly, exactly do you say contradicted it? The conclusion that the 2002 agreement was reasonably susceptible of an agreement by Lam Research to transfer to Aspect everything it needed to succeed in the auto etch and dry tech business. That is a warranty of fitness for a particular purpose. We promise that these goods that we're selling you will be fit for the purpose of succeeding in the auto etch and dry tech business. That's not what you just read. I mean, a warranty of fitness for a particular purpose usually says that. I'm not sure I agree with that. If you warrant, if you promise that the goods are everything you need to succeed, that is a warranty that the goods are useful for the particular purpose of succeeding in that business. Well, that may not be. I mean, you know, okay. I'm sorry. I just, I wanted to be sure I understood your argument because I read it in the brief and I'm saying I don't understand this. It's not like a UCC warranty. It is like a UCC warranty. You don't. Your client drafted the agreement, right? The agreement was negotiated with drafts back and forth. My client certainly participated. So the warranty isn't that the part is going to actually function like part. The warranty was to transfer everything you need in order to be able to make these the, you know, I'm sorry, I can't remember the names of these things. Auto etch and dry tech. Arch tech and dry tech work. That's a warranty of fitness for a particular purpose. Okay. These are going to be the goods you need. You have one case that says that? I don't have a case that says that a warranty that the goods will work in a particular or for a particular reason is a warranty of fitness for a particular purpose, Your Honor. Okay. That's all right. Thanks. The contract provided no warranty on assets. The assets sold under this agreement are sold as is and where is. As is is a particularly significant disclaimer under the Uniform Commercial Code. The assets have no warranty expressed or implied, including without limitation, any warranty of merchantability. Everything you need to succeed in the business, that's a merchantability representation or fitness for a particular purpose. The contract said aspect represents that it is capable of inspecting the assets purchased here under without assistance from LAM, that it is not relying on any representation or warranty of LAM in making its decision to purchase the assets. I submit that that is directly contrary to the extrinsic evidence that was offered that there was no list of assets to be purchased as is, where is, with no warranty, but an agreement that everything you need to succeed will be transferred. That everything you need to succeed term substituted for proof of any actual agreement on assets to be bought and sold. Significantly, all four claims that the Court found triable in the summary judgment decision depended on proof of a specific list of parts or products. The claim about removing parts from an agreed list required an agreed list of parts from which LAM Research removed parts that aspect had agreed to purchase. If there was never agreement on a list of parts, that is an impossible claim. There must be agreement on a list, and then parts must be removed from the list. The claim with respect to not providing drawings and specifications. Drawings and specifications weren't required to be provided under the contract. There was a license with respect to them, but even if they had been, the only ones that were required to be provided were drawings and specifications for the assets, the parts or products, on Exhibit A, on the list of parts. It was agreed, it was undisputed that we provided access to drawings and specification for all the parts that were delivered. There simply was no proof that any drawing or specification that was required to be provided under the contract wasn't provided. It was limited to drawings and specifications for the parts and products on Exhibit A. There was no Exhibit A. The stale parts. The evidence was undisputed that LAM Research sent aspect with notice in advance of the contract, a big shipment of parts that LAM Research told them had not been used within the last five years. There hadn't been movement on those parts in the last five years. But if there was a warranty, and we dispute that in the briefs, the warranty related only to the assets on Exhibit A. With no Exhibit A, there was no warranty to breach. With respect to the test fixtures that were to be provided under the 2004 agreement, the test fixtures that were to be provided under the claim that went to the jury were test fixtures that were currently being used exclusively for the manufacture of auto etch and dry-tech parts. Zero evidence on that, and zero evidence about any injury from a 2004 delivery. Substituting this inconsistent argument that LAM Research had not provided any LAM Research promised to provide a turnkey operation, everything you need to succeed in the business, short-circuited the claims that were actually submitted for trial, which depended upon particular parts, particular parts for drawings and specs, particular parts that might be warranted, particular parts that had been on a previously agreed list and weren't particular test fixtures. So that we end up with, even if you construe the contract like that, no real idea of what LAM Research's obligations were under the contract. What is everything you need to succeed? How much does it cost? There's no price term under the contract that they tried to show. How many units were supposed to be provided? The quantity term was supposed to be on Exhibit A. There's nothing from which to measure the obligation. So when you get to damages, it's, gee, we should have had a whole business. It's unconnected with the claims that were submitted for trial. And again, I submit it is the description of the assets as everything you need to succeed is a warranty of merchantability, is a warranty of fitness for a particular use just by its terms. It was error for the Court to let the four claims to which the trial was limited go to the jury on that theory. I'll reserve. Okay. Thank you, Mr. Bailey. Mr. Maddox. Good morning. I am David Maddox, and I have the privilege of representing Aspect Systems. And James Williams is here assisting me, as he did at the trial. There are a lot of issues that he briefed, and he dealt with only one. So I'll kind of reply to his, what his argument is, and then let you ask me any questions you might want to. I would, though, first of all, just obviously ---- Well, if I understand it, his, Mr. Bailey's, primary position is that this entire deal turned on Exhibit A, which is missing in action, and therefore, the whole theory has to go out. And in addition, there was a warranty of merchantability, which is fitness for a particular purpose, which can't be determined given the absence of Exhibit A. How about responding to that? Glad to, Your Honor. First of all, the Court dealt with this in great detail in its opinion, which is in the Exhibits at 5 through 24, but let's just break it down. The question is not whether or not there was an Exhibit A. It is what was Exhibit A contemplated by the parties to include. And there's plenty of evidence on that. And again, we're dealing with a jury verdict here. We're not dealing with a summary judgment. So if you go and take a look at it, first of all, there was no warranty, as he claims, for success in the business. The obligation was to transfer what was necessary to conduct the business. And the issue really comes back to, was Exhibit A the transfer of a business, which is the business of Autoetch and Dry Tech, and the specific terms that are utilized are manufacturing, refurbishment, service, and repair of those machines? And what evidence was there in the documents? And I'd like to look at the documents to make sure that we're clear on what we're talking about. If you look in the 2004 agreement, it starts out with the title, Asset Sales and License Agreement. It's not just an asset sale agreement. The whereas clause clearly defines that what is going to be provided is what is necessary to do this business, manufacture, refurbishing, servicing, and repair of the Autoetch and Dry Tech. Now, we talk about Exhibit A and what was Exhibit A. It's undisputed that Exhibit A was never provided. I would point out to the Court, as the Court has noted, it was their obligation to provide Exhibit A. They drafted the agreement. The agreement itself also provided that within 30 days of the effective date, there was to be an updated Exhibit A. That's in there isn't an agreement in evidence that has an effective date. That wasn't provided either. So what he's basically arguing is we didn't give you what we said we'd give you in terms of documentation. Therefore, you lose. Well, not so easy, because when you look at the evidence of what was to be included on Exhibit A, you can draw that, first of all, from the document itself, from the contract, and also from the testimony of the individuals that were involved. Paul Mazula, who was our negotiator on that, very clearly said what was Exhibit A. It was to be an all-inclusive document that included both an inventory and a parts list. He used the term bill of materials. Well, what was it supposed to have on it? It was supposed to have on it every single thing necessary to manufacture one of these things from the concrete up, all the parts, all the assemblies, et cetera. Now, I draw that from his testimony, which the jury heard, but I also draw it from the document, okay? When the judge very wisely talked about parole evidence, and again, parole evidence was something everybody agreed had to be done. I mean, even Mr. Bailey in one of his preliminary motions said, yep, there's going to have to be parole evidence. Well, he, in his instructions, very clearly said the first thing you do in making that determination of what these terms mean and what is involved is it's from within the document as a whole. It's got to be consistent with the document. So let's look at the document. There are some key provisions in the documents. Perhaps the most significant one is 8, 3 little i's, which is the license. And what was it that was supposed to be given? Well, what was supposed to be given was the IP that was encompassed in all of the drawings and specifications necessary for making any part at all that is included in those machines, also the assemblies and the components. It's undisputed that that never happened. Mr. Mazzullo testified again and put flesh on this. There are in the record, you will find copies of emails that went back and forth where Mr. Mazzullo is begging for IP that was not provided. He testified that he made a list of what he needed and they didn't give it to him. They gave him access to what's called MyLAM, which is a computer system, but they didn't give him the identification numbers of the parts. So you had a computer system that just was worthless to be used. You also had testimony, and it was actually the district judge who got this out of one of their main witnesses, that these so-called common parts that were pulled off the earlier representative list were to be included. And not only were they to be included, you couldn't do the deal without them. Now, you look again at the contract. You move to paragraph 7A, sole supplier. If you look at 7A, it says that what we were being provided were what was necessary so that ASPEC could sell back to LAM parts and assemblies. Well, you can't sell back assemblies if you don't have the, you know, the drawings and the IP. Clearly, it's part of Exhibit A. There's no question that the 2004 amendment stated very clearly that it was the transfer of a business and assets. So, I mean, what they were giving was not a warranty. They were giving these businesses to ASPEC. And in order to do these businesses, the testimony, I think, is clearly undisputed. There are things you had to have. And these four things that are the breaches of contract are things you had to have. Some other evidence to show you exactly what should have been given and which was part of Exhibit A, if you look at, there is a memo, an announcement that was brought out, it's in the record on page 419, two weeks after this was done where LAM itself reports to its own people that they are providing ASPEC with the IP rights, quote, necessary to manufacture parts formerly manufactured by LAM. LAM manufactured everything. Now, was it a business or was it just used parts? What was it that was transferred? They called several witnesses. The two key witnesses that I would ask you to take a look at are Paul Charette and Karsten Thiest. Why are they important? They're important because they were the negotiators. Karsten Thiest negotiated the 2004 amendment. Paul Charette negotiated the 2002, the original agreement. And Paul Charette testifies, and it's in the record at page 275, we are selling the business. Now, later in Trial Exhibit 50, and Judge Wake jumped on this one, there is an exchange between Mr. Charette and Mr. Thiest where Mr. Charette says what they're getting is a fixed income stream. They're getting a whole business. And that's, again, the Court concluded from that very clearly they were getting a business, they were getting an income stream. Karsten Thiest testified regarding the 2004 amendment, and he said what LAM transferred was a business. Now, there are other references to Exhibit A if you go back to the license provisions where it clearly says that Exhibit A would include an identification of these machines. So whatever Exhibit A was, it was supposed to have all the parts that were included in the machines. It was supposed to have, you know, the amount of those parts that were being provided, if they were being provided. It was supposed to have the assemblies that were required, you know, everything that was required to do these businesses. Now, there's no warranty that we're going to be successful at it, but you can't be successful at it if you don't have the IP to make these things. And, again, if you look at the license, this license clearly says we have the IP necessary for us to make it or for us to get somebody else to make it. And the clear testimony is that did not happen. This was a, you know, it just didn't work. We don't have to have Exhibit A to prove that there were damages. I mean, removal of parts. And, again, what parts are we talking about? Parts that are necessary for the business that was transferred. Where do we get that evidence? We get that evidence like we got nearly all of this evidence from emails back and forth within LAM that we got a hold of. SER 286 and 298 show that they pulled some of the parts off what they were going to provide us. And we're talking about the list. We're talking about what they were going to provide us that were needed in the machines, and they sold them themselves. And one of the, and it shows the kind of revenues that they were getting on an annual basis from them, and they're enormous. As far as whether or not these things that were provided were of any quality at all or whether they were, as we said, junk, you know, that's the simplest one of all. You go to the 2004 amendment, and the parties stipulated, we sold you a couple of million dollars' worth of parts, and in two years you've been able to sell $90,000 worth of them. I mean, it was junk. Now, what about this warranty question? He says, well, there wasn't any warranty. It's one of these give and take kind of things. Well, let me just tell you, the agreement says there are no warranties, so there are no warranties. But then the agreement also says very clearly, well, there are representations here, and the representations are that Lamb's been using this stuff. It's not junk. And the Court very clearly took the California law on this point that you can't basically give a warranty and then take it away by some all-inclusive statement. They made a warranty. It was one of the things, and the parts were just junk. Now, as far as needing the IP and whether we had it, again, as I told you, there are documents, again, Lamb documents. The desperate need for them was requested by Mr. Mazzullo. That's SCR 290. Then you can go back and take a look at another exhibit, which is by one of their own people. Okay, one of their own people just wrote an internal memo and said, hey, the agreement says they get this stuff, and they need this stuff. And that's SCR 294, and they didn't get the stuff. Now, the last one on test and assembly equipment, again, Lamb identified what that was. They brought the witness. It's SCR 308 through 317. All of that stuff is detailed out. All of it was to have been provided, and the evidence is it was not provided. Now, Mr. Bailey cited some evidence on the other side. Fine. There was evidence on the other side on some of these issues. But, again, we're not dealing with a summary judgment here. We had a jury that was fully instructed and set in an almost, I guess, four or five days of testimony, and they heard the evidence and made the decisions. This judge, in his opinion, very carefully analyzed all of it and laid it out in great detail as to why he decided what he decided, why he submitted what he submitted. And his conclusions are very strong. I'll just read one of them to you. It's ER 9 out of his opinion. Moreover, the jury had powerful evidence that in the party's final understanding, Exhibit A was supposed to include all parts necessary to support auto etch and dry-tech lines, regardless of what physical inventory Lamb was going to transfer to Aspect. That was the trial judge's conclusion based on the evidence, and ultimately, that was the jury's conclusion based on the evidence. And there's ample evidence for them to have made that conclusion. The standard before this Court is inferences are in the favor of the jury verdict. I mean, you know it better than I do. It is to be viewed the evidence in the light most favorable to the nonmoving party. That's us. And even under certain circumstances, the U.S. Supreme Court says you disregard all evidence favorable to the moving party. But in this case, there was substantial evidence. And, again, I encourage the Court, go back and look at that, you know, 19-page opinion the district judge did, because he lines out the evidence. I mean, he's very detailed and methodical as to what the evidence is and why he did everything he did and clearly there is enough evidence for it to have gone to the jury and there was plenty of evidence for the jury to do it. I mean, I use this example in my rebuttal argument. I said, you know, what Lamb is doing is telling you they've committed the perfect crime. They didn't give you what they said they were going to give you in the documents, therefore, you lose. You know, as the evidence shows, they took this business, ultimately gave it to somebody else. They shut down selling parts to our company and, in effect, destroyed this company. And that's in the record, too. And now they're just saying, well, you know, you don't have it, so you lose. I don't think that's what should happen. Let me just close with two real quick points. We had an appeal also here of an issue. They awarded interest to Lamb on parts just simply because we agreed we ought to pay for the parts as part of the damage judgment. And all parties now agree, and they've given up their opposition to it under California law, there's no right for any kind of interest award to them. So what we're asking, I'm going to read you two conclusions very quickly that the judge made, and then I would like to just ask for the relief we want. The Court held that using all of this evidence, the jury could calculate the amount of profit that Aspect lost from Lamb's breaches with reasonable certainty. He went on to say there was ample evidence for the jury to conclude that Lamb committed the specific breaches and to determine Aspect lost profits with reasonable certainty. And so we're asking the Court to reinstate the jury verdict, which means the original judgment, the district court amended judgment, should be vacated and the district court's original judgment against Lamb based on the jury verdict should be reinstated. Thank you. Thank you, Mr. Maddox. Mr. Bailey. Mr. Maddox made at the outset the concession that I think we need. He conceded that there was no agreement on an Exhibit A. There never was an Exhibit A. The question he then said, what was Exhibit A contemplated by the parties to be? He said, Lamb Research had an obligation to provide Exhibit A. No Exhibit A comes into existence by virtue of an agreement on what parts Aspect agrees to purchase and what parts Lamb Research agrees to sell. If there is no agreement, there is no obligation. What Aspect did at trial was substitute a wish-upon-a-star agreement, everything you need to succeed in the business, for what the contract unambiguously required, which was a list of assets that Lamb Research agreed to sell and Aspect agreed to purchase. And you can't measure damages from breach of an agreement to provide everything that anyone might need without knowing what the price was, what the quantities were, what the specific assets were. There was no proof of any of that. The proof at trial was an arm wave as opposed to proof of the specific facts that were required to prove the claims that the Court reserved for trial, all of which required an agreed list of parts, an agreed list of assets from which we removed parts. What did we remove parts from? If there's no agreed list, there's no civil wrong in removing parts from a negotiating list. Until there's an agreement on a list, removal of parts from an agreed list has no meaning. We don't have to provide drawings and specifications, even if a mere naked license requires providing trade secrets or drawings and specifications, except with respect to the parts that the parties have agreed will be purchased and sold. What Exhibit A might have been had there been an agreement is no substitute for an agreement. If you have some questions, I'll submit on that basis. I don't think so. Thank you, Mr. Bailey. Thank you. Counsel, the matter just argued will be submitted, and the Court will be in recess for the morning. All rise.
judges: Trager, Alarcon, Rymer